[No. B003338. Second Dist., Div. Three. Feb. 7, 1985.]

THE PEOPLE ex rel. FRANCHISE TAX BOARD, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
SAFECO LIFE INSURANCE COMPANY, Real Party in Interest.

528

COUNSEL

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Herbert A. Levin, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Parker, Milliken, Clark, O'Hara & Samuelian, Richard L. Carico, Richard D. Robins, Claire D. Johnson and Leslie W. Mullins for Real Party in Interest.

OPINION

DANIELSON, J.—The People of the State of California, acting through the Franchise Tax Board (FTB) have filed a petition for a writ of mandate to compel respondent superior court to vacate its order denying the petition of the FTB for an order to compel compliance with its subpoena duces tecum and to make a new and different order compelling such compliance. We grant the petition.

### THE ISSUES PRESENTED

The issues presented in this proceeding are whether an administrative subpoena duces tecum issued by the FTB requiring an insurance company to identify policyholders under its deferred annuity plan and to disclose the

amounts of interest and other income credited to the custodian accounts of those policyholders (1) was regularly issued, (2) whether it violates the right to privacy guaranteed by article I, section 1, of the California Constitution, (3) whether it violates the California Right to Financial Privacy Act, and (4) whether the FTB can be estopped to change its position retroactively as to the taxability of certain income, in a special proceeding under Government Code section 11188 to compel compliance with that administrative subpoena.

STATEMENT OF THE CASE

On February 25, 1982, the FTB issued a subpoena duces tecum (subpoena) to, and on March 2, 1982, served it on Safeco Life Insurance Company (Safeco).[1]

The subpoena sought the following information: "Names, addresses and social security numbers for each individual with a California address who is, or was, a policyholder in Safeco Life Single Premium Deferred Annuity Program for the period beginning January, 1977 through December, 1980.

"Furthermore, all books, records, statements and/or schedules indicating the amount of interest or other income credited to each individual's custodian account for the period beginning January, 1977 through December, 1980."

The subpoena was issued after a change in position by the FTB as to the taxability of income accumulated to the custodian accounts of policyholders in the Safeco life single premium deferred annuity program.

In early 1976 the FTB, following the lead of the Internal Revenue Service (IRS), had ruled that income accumulated and credited to an investor's custodian account during the period of accumulation between the purchase date

---

[1]Revenue and Taxation Code section 19254 provides as follows: "(a) The Franchise Tax Board, for the purpose of administering its duties under this part, including ascertaining the correctness of any return; making a return where none has been made; determining or collecting the liability of any person in respect of any liability imposed by this part (or the liability at law or in equity of any transferee in respect of such liability); shall have the power to examine any books, papers, records, or other data, which may be relevant to such purpose.

"(b) The Franchise Tax Board may require the attendance of the taxpayer or of any other person having knowledge in the premises and may take testimony and require material proof for its information and administer oaths to carry out the provisions of this part.

"(c) The Franchise Tax Board may issue subpoenas or subpoenas duces tecum, which subpoenas must be signed by any member of the Franchise Tax Board and may be served on any person for any purpose."

and the annuity date would not be currently taxable as income to the annuitant but would be taxable to the custodian account as income earned by a trust. In May 1977 the FTB, again following the lead of the Internal Revenue Service, changed its position to provide that such income would be includable in the gross income of the annuitant in the year so credited and would not be taxable to the custodian account as income earned by a trust.

The changed position of the FTB differed from that of the IRS in that the change of the IRS would apply only prospectively, but the change announced by the FTB would be retroactive to the date on which the policies were purchased.

The declaration of the representative of the FTB, requesting issuance of the subpoena, stated that FTB had determined "that the income and/or interest received by investors from the Safeco Life Single Premium Deferred Annuity Program is taxable" and that the FTB was requested to issue the subpoena "[i]n order to establish the taxable income of the individual investors." On its face, the subpoena recited that "The statutory purpose of this subpoena is to determine if the policyholders of Safeco Life Single Premium Deferred Annuity Program have complied with the provisions of the Personal Income Tax Law."

Contending that the subpoena suffered from statutory and constitutional defects, Safeco did not comply with it.

When Safeco failed and refused to attend and produce the papers as required by the subpoena, the FTB petitioned respondent superior court, pursuant to Government Code sections 11186, 11187 and 11188, for an order compelling Safeco to attend, testify, and produce the papers.[2] The court

---

[2]Government Code sections 11186, 11187, and 11188, relating to investigations and hearings by the executive department, provide:

Section 11186—"The superior court . . . has jurisdiction to compel the attendance of witnesses, the giving of testimony and the production of papers, books, accounts and documents as required by any subpoena. . . ."

Section 11187—"If any witness refuses to attend or testify or produce any papers required by such subpoena the head of the department may petition the superior court in the county in which the hearing is pending for an order compelling the person to attend and testify or produce the papers required by the subpoena before the officer named in the subpoena."

Section 11188—"Upon the filing of the petition the court shall enter an order directing the person to appear before the court at a specified time and place and then and there show cause why he has not attended or testified or produced the papers as required. A copy of the order shall be served upon him. If it appears to the court that the subpoena was regularly issued by the head of the department, the court shall enter an order that the person appear before the officer named in the subpoena at the time and place fixed in the order and testify or produce the required papers. Upon failure to obey the order, the person shall be dealt with as for contempt of court."

ordered Safeco to appear before the court and show cause why it had not complied with the subpoena and why it should not be ordered to do so.

After hearing argument, the court denied the petition of the FTB on January 26, 1983. The FTB filed a notice of appeal from the minute order, which we dismissed on May 2, 1983, without prejudice to the right of the FTB to seek a writ of mandate. (*Barnes* v. *Molino* (1980) 103 Cal.App.3d 46, 51 [162 Cal.Rptr. 786].) ■ ■■■■ The FTB filed a petition for writ of mandate on January 26, 1984,[3] and on March 7, 1984, we issued an alternative writ requiring respondent court to vacate its order and make an order granting the petition of the FTB or to show cause why a peremptory writ ordering it to do so should not issue.

## CONTENTIONS

The court's minute order recited that it denied the petition of the FTB ". . . for *all* of . . ." (italics in original) the following reasons: "The petition of the Franchise Tax Board should be denied because the subpoena was not *regularly* issued by the head of the department as that requirement has been interpreted by the courts of California.

"The *subpoena duces tecum* issued by the Franchise Tax Board violates the right to privacy of the policyholders as guaranteed by both Article I, Section 1 of the California Constitution and the California Right to Financial Privacy Act.

"The Franchise Tax Board is estopped from retroactively changing the method of taxing the investment annuities. Thus the subpoena seeks records which are irrelevant to any valid statutory purpose. Finally, the subpoena is overbroad. It does not relate to a particular taxpayer's records." (Italics in original.)

---

[3]Noting a lapse of almost nine months from the time the appeal of the FTB was dismissed and the petition for writ of mandate was filed, Safeco contends that the petition should be dismissed due to laches. We disagree.

Lapse of time, except where the statute of limitations has run, is never itself a defense; there must be unreasonable delay resulting in prejudice to the party raising the defense. Moreover, prejudice is not presumed but must be affirmatively demonstrated. (*Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 [166 Cal.Rptr. 826, 614 P.2d 258]; *Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359 [82 Cal.Rptr. 357, 461 P.2d 617].)

The FTB informed Safeco that Safeco would be held liable for any revenues lost as a consequence of delays caused by Safeco resisting the subpoena. Safeco argues that based on this assertion by the FTB there can be no question that the delay in bringing the petition will result in prejudice to Safeco. Safeco's contention, at most, constitutes mere speculation regarding the uncertain occurrence of future events rather than an affirmative demonstration of prejudice.

In its petition for writ of mandate the FTB controverts each of those reasons.

Further, the FTB contends that 1) the writ should issue because it has no plain, speedy and adequate remedy in the ordinary course of law to review the respondent court's order; 2) the respondent court's order is a failure of that court to exercise its jurisdiction and an act in excess of its jurisdiction, and that 3) the making of the order granting the relief for which the FTB had petitioned is an act the performance of which the law specially enjoins as a duty resulting from that court's office, trust and station. (Code Civ. Proc., §§ 1085-1086.)

In support of its contentions the FTB argues, inter alia, that it cannot be estopped or enjoined from the collection of any tax and that the refusal of the respondent court to compel compliance with its subpoena does, in effect, "prevent or enjoin the collection of" personal income tax in violation of California Constitution, article XIII, section 32.

## DISCUSSION

■ Mandamus is the appropriate remedy to compel an inferior tribunal to perform a nondiscretionary act which the law specially enjoins; the writ must be issued in all cases where there is no plain, speedy and adequate remedy in the ordinary course of the law. ■ By issuing the alternative writ we have determined that the FTB has no other adequate remedy and this is a proper case for the exercise of our original jurisdiction. (Code Civ. Proc., §§ 1085, 1086; *Lewis* v. *Barclay* (1868) 35 Cal. 213; *Johnson* v. *Superior Court* (1929) 102 Cal.App. 178, 191 [283 P. 331]; *Tri-County Elevator Co.* v. *Superior Court* (1982) 135 Cal.App.3d 271, 273, fn. 1 [185 Cal.Rptr. 208].)

### The Duty and Authority of the FTB to Investigate

The Franchise Tax Board is charged with the duties of administering and enforcing the Personal Income Tax Law.[4] (Rev. & Tax. Code, §§ 17001, 19251.) For the purpose of administering those duties, including determining or collecting the liability of any person imposed by the Personal Income Tax Law, the FTB has been given broad statutory powers. Those powers include the power to examine any data relevant to that purpose, to require the attendance of any person having knowledge in the premises, to take

---

[4]Revenue and Taxation Code, division 2, part 10, is known as the Personal Income Tax Law. It includes sections 17001 through 19452 of that code.

testimony, administer oaths and to require material proof for its information. The FTB may also issue subpoenas duces tecum which may be served on any person for any purpose. (Rev. & Tax. Code, § 19254, fn. 1, *ante*.)

*The Jurisdiction of the Superior Court in a Special Proceeding Under Government Code Sections 11187 and 11188* [4.1]

Respondent court erred in ruling that the subpoena "... was not *regularly* issued by the head of the department as that requirement has been interpreted by the courts of California." (Italics in original order.)

Sections 11180-11191 statutorily authorize investigations by each department of the executive branch of our state government of all matters under the jurisdiction of the department. As a part of those investigations Government Code, section 11181 authorizes the department to inspect books and records and to "[i]ssue subpoenas for the attendance of witnesses and the production of papers, books, accounts, documents and testimony in any inquiry, investigation, hearing or proceeding pertinent or material thereto . . . ." This authority is substantially the same as that granted specifically to the FTB by Revenue and Taxation Code section 19254, *ante* (fn. 1).[5] These investigations are not judicial proceedings, they are administrative inquiries. "[S]ections 11180-11191 relate not to *judicial proceedings* but instead to statutorily permitted *investigations* in which the court ordinarily plays no part." (Italics in original.) (*People* v. *West Coast Shows, Inc.* (1970) 10 Cal.App.3d 462, 470 [89 Cal.Rptr. 290].)

If a witness refuses to comply with a subpoena issued in connection with such an investigation, section 11187 (fn. 2, *ante*) authorizes the department to petition the superior court for an order compelling the witness to comply. Section 11188 (fn. 2, *ante*) provides that upon filing such petition the court shall enter an order to show cause why there has not been compliance, and if it appears to the court that the subpoena was regularly issued "... the court *shall* enter an order . . . ." directing the subpoenaed person to comply. (Italics added.) It is further provided in section 11188 that upon failure to obey the order "... the person shall be dealt with as for contempt of court."

---

[4.1] In this section of this opinion references to sections 11180 through 11191 are to the Government Code.

[5] The authority of the FTB to investigate and to issue subpoenas under Revenue and Taxation Code section 19254, and under Government Code sections 11180-11191, is substantially identical and we hold that such authority is governed by the same principles and precedents.

■ The hearing under section 11188 is a special proceeding.[6] ■ In practice the term "special proceeding" is used in contradistinction to "action"; it refers only to proceedings which were not, under the common law or equity practice, either an action at law or a suit in equity. They are proceedings which may be commenced independently of a pending action, by petition or motion upon notice, in order to obtain special relief. (See *In re Sutter-Butte By-Pass Assessment* (1923) 190 Cal. 532, 537 [213 P. 974]; *Tide Water Assoc. Oil Co.* v. *Superior Court* (1955) 43 Cal.2d 815, 822 [279 P.2d 35]; 2 Witkin, Cal. Procedure (2d ed. 1970) Actions, §§ 12-15, p. 888 et seq.)

In *Brovelli* v. *Superior Court* (1961) 56 Cal.2d 524 [15 Cal.Rptr. 630, 364 P.2d 462], a case concerned with the availability of the remedies of sections 11180-11191 in a case in which no formal administrative hearing was pending, our Supreme Court stated, at page 529: "There is no constitutional objection to a system under which the heads of departments of government may compel the production of evidence for purposes of investigation, without instituting formal proceedings against the one from whom the evidence is sought or filing any charges against him.

"As has been said by the United States Supreme Court, the power to make administrative inquiry is not derived from a judicial function but is more analogous to the power of a grand jury, which does not depend on a case or controversy in order to get evidence but can investigate 'merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.' (*United States* v. *Morton Salt Co.,* 338 U.S. 632, 642-643 [94 L.Ed. 401, 70 S.Ct. 357].)" To the same effect, see *Younger* v. *Jensen* (1980) 26 Cal.3d 397, 404-405 [605 P.2d 813].

In the case at bench the special proceeding was commenced independently of a pending action, by petition, and in order to obtain special relief in the form of an order compelling compliance with the FTB's administrative subpoena; it is a remedy in aid of the duty and authority of the FTB to administer and enforce the Personal Income Tax Law and to conduct investigations of all matters within the jurisdiction of the FTB.

---

[6]*Judicial remedies are defined and classified in the Code of Civil Procedure as follows:*
*Section 20* "Judicial remedies are such as are administered by the Courts of justice, or by judicial officers empowered for that purpose by the Constitution and statutes of this State."
*Section 21* "These remedies are divided into two classes:
"1. Actions; and,
"2. Special proceedings."
*Section 22* "An action is an *ordinary proceeding* in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense."
*Section 23* "Every other remedy is a special proceeding."

■ The jurisdiction of the superior court in a hearing under section 11188 is strictly limited in scope. "Since special proceedings are created and authorized by statute, the jurisdiction over any special proceeding is limited by the terms and conditions of the statute under which it was authorized. [Citation.]" (*Woods-Drury, Inc.* v. *Superior Court* (1936) 18 Cal.App.2d 340, 344 [63 Cal.Rptr. 1184].) Thus a court sitting in a special statutory proceeding has no equitable jurisdiction. (*City of Pasadena* v. *Porter* (1927) 201 Cal. 381, 388 [257 P. 526, 53 A.L.R. 679].)

In a hearing pursuant to section 11188 the court is limited to determining whether the subpoena conforms to legal and constitutional standards. As the court stated in *Fielder* v. *Berkeley Properties Co.* (1972) 23 Cal.App.3d 30, at page 39 [99 Cal.Rptr. 791]: "[The hearing in the superior court] . . . pursuant to Government Code section 11188 . . . is confined to determining whether the subpoena conforms to legal and constitutional standards. With respect to the legal standards the inquiry, in the language of section 11188, is whether the subpoena 'was regularly issued by the head of the department.' As provided in section 11188 'If it appears to the court that the subpoena was regularly issued by the head of the department, the court *shall* enter an order that the person appear before the officer named in the subpoena at the time and place fixed in the order and testify or produce the required papers.' (Italics added.) The term 'regularly issued' means in accordance with the provisions of sections 11180, 11181, 11182, 11184 and 11185 of the Government Code providing for the matters which may be investigated, the acts authorized in connection with investigations, and the service of process."

The *Fielder* court pointed out that the hearing on the order to show cause pursuant to section 11188 is not a hearing in the nature of that on a motion to quash. "Such a hearing [as on a motion to quash] is not within the contemplation of the subject administrative inquiry and investigation." (*Id.*, at p. 40.)

Our Supreme Court also pointed out in *Brovelli* v. *Superior Court, supra,* 56 Cal.2d at page 529, that, of course, department heads cannot compel the production of evidence in disregard of constitutional rights and safeguards. In doing so, our Supreme Court also established guidelines defining the permissible reach of an administrative subpoena duces tecum issued under section 11181, stating: "Insofar as the prohibition against unreasonable searches and seizures can be said to apply at all it requires only that the inquiry be one which the agency demanding production is authorized to make, that the demand be not too indefinite, and that the information sought be reasonably relevant. [Citations.]" (*Id.*, at p. 529.)

Thus, in *Brovelli,* the court defined the scope of the inquiry under section 11188 to include constitutional rights, and the permissible reach of the subpoena, as well as the question of whether the subpoena was regularly issued.

If a person served with an administrative subpoena, issued by the FTB as authorized by Revenue and Taxation Code section 19254, believes that it was not regularly issued or that the requirements of *Brovelli* v. *Superior Court, supra,* 56 Cal.2d 524, are not met he need not respond. It is then the right and obligation of the investigating agency to petition the superior court for an order compelling compliance with the subpoena, as provided by sections 11187 and 11188, *ante* (fn. 2). At the resulting hearing the superior court may judicially test whether the subpoena duces tecum conforms to the requisite legal and constitutional standards. "Thus, the Government Code provides an opportunity for adjudication of all claimed constitutional and legal rights before one is required to obey the command of a subpoena duces tecum issued for investigative purposes." (*People* v. *West Coast Shows, Inc., supra,* 10 Cal.App.3d 462, 470.)

*The Subpoena Duces Tecum Was Regularly Issued by the Head of the Franchise Tax Board*

 We have examined the record and find that the declaration of the FTB representative in support of the subpoena states facts which establish that the inquiry is one which the FTB is authorized to make. Our examination of the subpoena establishes that it is duly signed, that the demand is not too indefinite, and that the information sought is reasonably relevant to the duties of and intended investigation by the FTB. (*Brovelli* v. *Superior Court, supra,* 56 Cal.2d 524 at p. 529; *People* v. *West Coast Shows, Inc., supra,* 10 Cal.App.3d 462 at p. 470.) Safeco's contention that the subpoena is overbroad is wholly without merit, and the trial court's ruling to that effect is error. In all respects the subpoena conforms to the legal standards of Government Code sections 11180, 11181, 11182, 11184 and 11185. (*Fielder* v. *Berkeley Properties Co., supra,* 23 Cal.App.3d at p. 39.) We conclude as a matter of law that the subpoena is regularly issued.

*The Subpoena Duces Tecum Issued by the FTB Does Not Violate the Right to Privacy of Safeco's Policyholders as Guaranteed by Article I, Section 1, of the California Constitution*

 The basic test of whether there has been a violation of the constitutional right of privacy is whether a person's personal and objectively reasonable expectation of privacy has been infringed by unreasonable govern-

mental intrusion. (*Armenta* v. *Superior Court* (1976) 61 Cal.App.3d 584, 588 [132 Cal.Rptr. 586].)

■ The law requires payors of interest and other determinable income to report to the FTB the information which was sought by the subpoena in this proceeding.[7] Payors of interest must also report such information to the IRS. (26 U.S.C. § 6049.)[8] It is common knowledge that payments and credits of interest and dividends are reported by the payors to the FTB and the IRS. In light of such reporting requirements, recipients of interest and other such income have no reasonable expectation of privacy as to such information. We therefore hold that the subpoena does not violate the right to privacy guaranteed by article I, section 1 of the California Constitution.

*The Subpoena Does Not Violate the California Right to Financial Privacy Act. (Gov. Code, §§ 7460-7493)*

■ The subpoena seeks the identity of those individuals who were policyholders in Safeco's deferred annuity program during a specified period of time, and the amounts of interest or other income credited to their custodian accounts during that time. As we have pointed out above, the law requires payors of interest and other determinable income to report that very information to the FTB. (Rev. & Tax. Code, §§ 18802-18803, fn. 7, *ante.*) It is common knowledge that information returns, reporting such payments and credits, have been furnished by the payors thereof to the FTB and the IRS for many years. Neither the payors nor the payees have any reasonable expectation of privacy as to that information.

---

[7]Revenue and Taxation Code sections 18802 and 18803, a part of the article of the Personal Income Tax Law which authorizes the requirement of information returns, provide, in part, as follows: § 18802. "(a) Every . . . insurance company, . . . engaged in . . . business in this state and making payment in the course of such . . . business to another person, . . . of interest . . . dividends, . . . or other . . . determinable annual or periodical gains, profits, and income . . . paid or payable during any year to any taxpayer, shall make a complete return to the Franchise Tax Board, . . .

§ 18803. Information returns; . . .

"Such a return may be required, regardless of amounts, in the case of

"(a) Payments of . . . interest on amounts held by an insurance company under an agreement to pay interest thereon; . . .

"(b) Dividends paid by corporations."

[8]Safeco contends that it is not a payor of interest and thus has no statutory obligation to report the information sought by the FTB. We note that irrespective of Safeco's status as a payor of interest and any concomitant obligation to report the information pursuant to Revenue and Taxation Code sections 18802 and 18803, Safeco is obligated to produce the information and data as commanded by the subpoena pursuant to the authority of section 19254 of the Revenue and Taxation Code, *ante,* footnote 1 and Government Code section 11181.

Furthermore, we note that the California Right to Privacy Act applies only to "financial institutions" as defined by that act (Gov. Code, § 7465). Insurance companies are not included within that definition. Safeco is an insurance company. Therefore, that act does not apply to Safeco.

We also note that the information sought by the subpoena is expressly excluded from the restrictions of the "Privacy Act."[9] Further, if the Privacy Act, a statute, should come in conflict with section 32 of the California Constitution, the Privacy Act, as a statute, would have to yield.

*The FTB Cannot Be Prevented or Enjoined From the Assessment or Collection of Any Tax*

 The power to tax is essential to the existence of a government. In order to protect that power the people of the State of California have expressed the fundamental laws governing taxation in our Constitution and statutes. (Civ. Code, §§ 22, 22.1.) California Constitution, article XIII, dealing with taxation, provides in part: Section 31. "The power to tax may not be surrendered or suspended by grant or contract."

Section 32. "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature."

Section 33. "The Legislature shall pass all laws necessary to carry out the provisions of this article."

For convenience, we will refer to the above provisions as section 31, section 32 and section 33.

Sections 32 and 33 are implemented in the Personal Income Tax Law by Revenue and Taxation Code section 19081, which provides, in part: "No injunction or writ of mandate or other legal or equitable process shall issue in any suit, action, or proceeding in any court against this State or against

---

[9]Government Code section 7480 provides, in pertinent part: "Nothing in this chapter [chapter 20, California Right to Financial Privacy Act] prohibits any of the following:

" . . . . . . . . . . . . . . . . . .

"(e) The disclosure to the Franchise Tax Board of . . . (2) financial records in connection with the filing or audit of a tax return or tax information return required to be filed by the financial institution pursuant to Parts 10 [the Personal Income Tax Law], 11, or 18 of the Revenue and Taxation Code."

any officer of this State to prevent or enjoin the assessment or collection of any tax under this part; . . ."

As stated by our Supreme Court in *Pacific Gas & Electric Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 277, 283-284 [165 Cal.Rptr. 122, 611 P.2d 463]: "The policy behind section 32 is to allow revenue collection to continue during litigation so that essential public services dependent on the funds are not unnecessarily interrupted. [Citation.] 'Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public.' [Citations.] . . . [¶] *We hold that section 32 means what it says.*" (Italics added.)

In *Pacific Gas & Electric Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d 277, our Supreme Court observed that since 1910 there have been constitutional provisions similar to section 32 which have been subject to numerous minor revisions and renumberings, and summarized changes in section 32 from 1910 to date. (*Id.,* at pp. 280-281, fns. 3 and 5.)[10]

The court also noted that section 32 applies only to actions against the state or the officers thereof. (*Id.,* at p. 281, fn. 6, citing *Eisley* v. *Mohan* (1948) 31 Cal.2d 637, 641 [192 P.2d 5].) The section does not preclude the issuance of a writ against county officers. (*Eisley,* at p. 642.)

Section 32 is a part of the fundamental law of our state, it is a mandate permitting no deviation. All statutes, all courts, and all lawsuits are subject to the Constitution. As our Supreme Court said in *Modern Barber Col.* v. *Cal. Emp. Stab. Com.* (1948) 31 Cal.2d 720, 725 [192 P.2d 916]: " 'The provision of the California Constitution is much more than a mere declaration of the rules generally applicable in proceedings for injunction, mandamus, or other legal or equitable relief.' . . . It follows that cases such as *Miller* v. *Standard Nut Margarine Co.,* 284 U.S. 498 . . . which discuss the various instances under which an injunction may be available according to the common-law rules of equity or under statutes restating them are not relevant here." (Accord *Eisley* v. *Mohan, supra,* 31 Cal.2d 637, 641; *Pacific Gas & Electric Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d 277, 282.)

It is also settled that injunctive relief is not available to restrain the collection of any tax even though the tax statute may be unconstitutional and

---

[10]For convenience we will do as did our Supreme Court and refer to all such provisions as section 32.

the alleged tax therefore void. (*Hunter-Reay* v. *Franchise Tax Board* (1983) 140 Cal.App.3d 875, 878 [189 Cal.Rptr. 810]; *Helms Bakeries* v. *St. Bd. Equalization* (1942) 53 Cal.App.2d 417, 422 [128 P.2d 167].)

*The Enforcement of a Subpoena Regularly Issued by the Franchise Tax Board in Accordance With Revenue and Taxation Code Section 19254 and Government Code Sections 11180-11188, Is an Integral Part of the Tax Collection Process and Shall Not Be Prevented or Enjoined by the Legal or Equitable Process of Any Court*

Safeco argues, in opposition to the FTB's petition, that the bar of section 32 does not apply in the case at bench because the ruling of the trial court did not prevent or enjoin the FTB from the assessment or collection of any tax but only from obtaining information following the change in its position as to the taxability of income credited to the custodian accounts of some of Safeco's policyholders. This contention is without merit. Similar theses have been advanced, and rejected by our courts, in analogous situations.

In *Modern Barber Col.* v. *Cal. Emp. Stab. Com.*, *supra*, 31 Cal.2d 720, the petitioner for mandamus sought to compel the state agency to vacate its findings that an employer-employee relationship existed and thereby to avoid the requirement for contributions to the unemployment insurance fund. The court ruled against the petitioner stating, at page 723, "Since the net result of the relief prayed for herein would be to restrain the collection of the tax allegedly due, the action must be treated as one having that purpose."

In *Pacific Gas & Electric Co.* v. *State Bd. of Equalization*, *supra*, 27 Cal.3d 277, the petitioners for mandate and declaratory relief sought to compel the state board to adjust the assessment of their real property. Our Supreme Court concluded that petitioners' action was barred by section 32 and that their proper recourse was to pay the tax and then to sue for a refund. The court stated, at page 280, ". . . the assessment of real property is an integral part of the taxing process, and a court order invalidating an assessment will in effect 'prevent or enjoin the collection' of the tax. [Citations.] It is also the rule that a taxpayer may not circumvent restraints on prepayment tax litigation by seeking only declaratory relief. [Citations.]"

In *Helms Bakeries* v. *St. Bd. Equalization* (1942) 53 Cal.App.2d 417, 423-424 [128 P.2d 167] (cert. den. 318 U.S. 756 [87 L.Ed. 1129, 63 S.Ct. 530]), where the petitioner had not sought directly to enjoin the collection of the tax, but to enjoin the board from revoking or suspending its seller's

permit under the sales tax law, the question presented was whether the suit could reasonably be held to be one to enjoin the collection of a tax. Holding in the affirmative the court cited authority stating, " 'A suit to enjoin a tax and a suit to enjoin the use of the means provided by the taxing statute for the collection of the tax would seem to be the substantial equivalents of each other.' " (*Id.*, at p. 424.)

And in *Hunter-Reay* v. *Franchise Tax Board, supra,* 140 Cal.App.3d 875, 881, the court held that the seizure of noncash assets pursuant to a jeopardy assessment, while not tantamount to the collection of the tax, was the first step in the collection process and that the exclusive means of obtaining judicial review of the legality of a tax assessment is to file a petition for a refund. "This procedure is constitutional and does not deprive the taxpayer of due process of law." (*Ibid.*)

In the light of such precedents it is apparent, and we find, that the enforcement of a subpoena regularly issued and prosecuted by the FTB, in accordance with Revenue and Taxation Code section 19254 and Government Code sections 11180-11191, is a first step in the collection of a tax and an integral part of the tax collection process, and section 32 mandates that it shall not be prevented or enjoined by the legal or equitable process of any court. The "purpose" of Safeco's action to prevent enforcement of the subpoena is clearly restraint. Thus the court's order is barred by section 32.

*The Exclusive Means of Judicial Review of Tax Proceedings in California Is to Pay the Tax and Then Sue to Recover the Alleged Overpayments. This Procedure Is Constitutional and Does Not Deprive the Taxpayer of Due Process of Law*

a. *Suits for Refunds by Taxpayers*

■ Revenue and Taxation Code sections 19081 and following provide the manner in which a taxpayer may maintain an action to recover a tax paid under the Personal Income Tax Law, with interest, if the taxpayer claims the tax to be illegal.[11]

---

[11]Similar provisions, implementing article XIII, sections 32 and 33, are found in the Alcoholic Beverage Tax Law, section 32411; the Bank and Corporation Tax Law, section 26101; the Cigarette Tax Law, section 30401; the law governing insurance taxation, section 13101; the Motor Vehicle Fuel License Tax Law, section 8146; the Private Railroad Car Tax Law, section 11571; the Sales and Use Tax Law, section 6931; and the Use Fuel Tax Law, section 9171. All section references in this footnote are to the Revenue and Taxation Code.

In *Modern Barber Col.* v. *Cal. Emp. Stab. Com., supra,* 31 Cal.2d 720, our Supreme Court stated: ". . . [T]he remedy of suit to recover taxes paid has expressly been made the exclusive means of obtaining a judicial review of the legality of the assessment." (*Id.,* at p. 724.)

"The due process clause does not guarantee the right to judicial review of tax liability before payment. The power of a state to provide the remedy of suit to recover alleged overpayments as the exclusive means of judicial review of tax proceedings has long been unquestioned. [Citations.] This is also the law in this state: 'The prompt payment of taxes is always important to the public welfare. It may be vital to the existence of a government. The idea that every tax-payer is entitled to the delays of litigation is unreason. . . .'" (*Id.,* at pp. 725-726.) (Accord *Aronoff* v. *Franchise Tax Board* (1963) 60 Cal.2d 177, 179 [32 Cal.Rptr. 1, 383 P.2d 409]; *Dupuy* v. *Superior Court* (1975) 15 Cal.3d 410, 416 [124 Cal.Rptr. 900, 541 P.2d 540]; *Pacific Gas & Electric Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d 277, 283-284; *Horack* v. *Franchise Tax Board* (1971) 18 Cal.App.3d 363, 370 [95 Cal.Rptr. 717]; *United States Steel Corp.* v. *Franchise Tax Board* (1983) 144 Cal.App.3d 473, 481-482 [192 Cal.Rptr. 677].)

*Modern Barber Col.* v. *Cal. Emp. Stab. Com., supra,* 31 Cal.2d 720 at page 725, and *Pacific Gas & Electric Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d 277 at page 282, appear to hold that there are no equitable exceptions to this rule. (See also *California* v. *Grace Brethren Church* (1982) 457 U.S. 393 [73 L.Ed.2d 93, 102 S.Ct. 2498], noting approvingly *Modern Barber Col., Aronoff,* and *Pacific Gas & Electric Co., supra,* 457 U.S. at p. 400, fn. 10 [73 L.Ed.2d at pp. 101-102].)

b. *The Constitutional Bar of Section 32 Does Not Deny Due Process to Safeco, a Nontaxpayer, Under the Facts of This Case*

As we have seen, the decisions of our courts have held that the due process clause does not guarantee the right to judicial review of tax liability before payment. The rationale of those decisions is that the remedy of suit to recover alleged overpayments of taxes, or illegal taxes, satisfies the due process requirements of the United States and California Constitutions.

Safeco implicitly contends that constitutional standards require that there be an exception to that rule where one who is not the taxpayer seeks to challenge a tax law or an action of a taxing agency.

Safeco's contention is that, assuming arguendo it was seeking to estop or enjoin the FTB from the collection of a tax, Safeco cannot be prevented

from doing so because Safeco will not be the taxpayer on the accumulations to the annuity policies it has sold and thus will not have an adequate remedy available to challenge the FTB's retroactive change of its position as to the taxability of those accumulations, that is, since Safeco is not the taxpayer it cannot pay the tax and sue to recover the tax paid. The thrust of Safeco's contention is that unless it can estop or otherwise prevent the FTB from enforcing its subpoena it will be harmed and will be without a remedy and, therefore, will be denied due process.

In an apparent effort to show that it has a sufficient stake in the matter to give it standing to sue, i.e., the right to relief in court (*Parker* v. *Bowron* (1953) 40 Cal.2d 344, 351 [254 P.2d 6]; *Sierra Club* v. *Morton* (1972) 405 U.S. 727 [31 L.Ed.2d 636, 92 S.Ct. 1361]) despite the constitutional bar of section 32, Safeco claims that it is ". . . an interested party since it sold . . ." the single premium deferred annuity policies ". . . and in conjunction therewith (and in reliance on the FTB's earlier ruling) it had represented to prospective policyholders . . ." that the income on the customers' accounts would not be currently taxable to the policyholder.

The same argument was presented and decided in *Investment Annuity, Inc.* v. *Blumenthal* (D.C. Cir. 1979) 609 F.2d 1, cert. den. 446 U.S. 981 [64 L.Ed.2d 837, 100 S.Ct. 2961], a case arising from a set of facts substantially identical to those in the case at bench, in which the validity of a statutory bar was challenged on the ground of denial of due process. In that case the seller of investment annuity policies brought an action seeking declaratory and injunctive relief, challenging a ruling of the IRS, which shifted its interpretation of a tax statute, and sought to enjoin the IRS from applying its new ruling to the purchasers of its investment annuities. The IRS opposed the action on the ground that it was barred by the federal Tax Anti-Injunction Act (26 U.S.C. § 7421(a)).[12] The insurer countered that since it was not a taxpayer under the policies there would be no opportunity to test the ruling of the IRS in a taxpayer's suit for refund. The district court held that the Tax Anti-Injunction Act did not apply when no one could question the validity of the ruling of the IRS in a tax refund suit and proceeded to reach the merits and granted the declaratory and injunctive relief sought.

The United States Court of Appeal reversed the district court, holding that ". . . in the absence of constitutional impediment . . ." the courts must

---

[12]The act reads, in pertinent part: "Except as provided in sections . . . no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." None of the statutory exceptions is relevant in this case.

respect the limits placed by Congress on their jurisdiction. (*Investment Annuity, Inc.* v. *Blumenthal* (D.C. Cir. 1979) 609 F.2d 1, 10; cf. *Modern Barber Col.* v. *Cal. Emp. Stab. Com.*, supra, 31 Cal.2d at pp. 724-731; *Cory* v. *Shierloh* (1981) 29 Cal.3d 430, 439 [174 Cal.Rptr. 500, 629 P.2d 8].)

In reaching its decision the Court of Appeal recognized that ". . . when the denial of judicial review rises to the level of a constitutional infirmity . . ." the Tax Anti-Injunction Act (a statute) must yield. (*Investment Annuity, Inc.* v. *Blumenthal* (D.C. Cir. 1979) 609 F.2d 1, 6.) The court pointed out that such an exception is not inferred from the statute, but has constitutional roots and due process concerns are relevant. The court went on to state that: ". . . not all denials of access to judicial review amount to due process violations. . . . [¶] Here, the injury caused by the shift in IRS's interpretation of the pertinent statute—a detrimental impact on appellees' business—does not invade any property interest cognizable under the due process clause. The challenged government action concerned the tax liability of investment annuity purchasers; it did not require [the insurers] to pay taxes and hence there was no government action that directly deprived them of property. Deprivation of property underlies the long-recognized right of taxpayer to judicial review of the assessment of taxes. [Fn. omitted.] Nor did the earlier private letter rulings on which appellees relied in building their business create any 'legitimate claim of entitlement.' [Fn. omitted.] Such rulings express the Commission's interpretation of the law at the time they are given, and may be taken into account subsequently, but they do not have the force of law and do not bind the Commissioner to adhere to the same position in the future. [Fn. omitted.] [¶] The fact that the government threatens to deprive a person of his property (by a tax assessment) may have pecuniary impact on a variety of other persons whose fortunes are in one way or another linked to him—his family, suppliers, [and others]. . . . But unless the persons are deprived of their own property, or a common law or statutory right, there is no basis for a claim that government has 'deprived' them of property. [Fn. omitted.]" (*Id.*, at pp. 7-8.)

The reasoning of the court in *Investment Annuity, Inc.* applies directly to the case at bench. It demonstrates that in a factual situation which is the substantial equivalent of that in the case at bench the seller of the investment annuity policies was not deprived of a property interest cognizable under the due process clause. We find the same to be true as to Safeco in the case at bench.

We also note that in its argument Safeco does not specify what property interest it has been "deprived" of by the action of the FTB, but only that

". . . without the opportunity to seek an estoppel, [it] would be harmed and denied due process. . . ."

In further support of its argument Safeco relies on *South Carolina* v. *Regan* (1984) 465 U.S. 367 [79 L.Ed.2d 372, 104 S.Ct. 1107]. Safeco's reliance is misplaced.

In *South Carolina* v. *Regan,* the State of South Carolina contended that a provision of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) was constitutionally invalid as violative of the Tenth Amendment and the doctrine of intergovernmental tax immunity. The TEFRA provision required that the state's bonds be in registered, rather than bearer, form to qualify for the federal tax exemption for interest earned on those bonds. This would require the state to pay its bearer bondholders a higher rate of interest, or require the state to issue its bonds in registered form, and thereby destroy the state's freedom to issue its bonds in the form that it chooses. Thus, the state argued, its power to borrow money was impaired by the TEFRA provision.

The state invoked the Supreme Court's original jurisdiction and asked leave to file a complaint against the Secretary of the Treasury seeking declaratory, injunctive, and other relief. The secretary objected to the state's motion on the ground that it was barred by the federal Tax Anti-Injunction Act (fn. 12, *ante*).

The Supreme Court reviewed the history of the Tax Anti-Injunction Act from the time of its enactment, in 1867, and held that ". . . the indicia of congressional intent [as to] the Act's purposes and the circumstances of its enactment—demonstrate that . . . the Act was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf. Because Congress did not prescribe an alternative remedy for the plaintiff in this case, the Act does not bar this suit." *South Carolina* v. *Regan, supra,* 465 U.S. 367, 381 [79 L.Ed.2d 372, 383].)

The decision in *South Carolina* v. *Regan* does not govern the case at bench. It is confined to a determination of the scope and purpose of the federal Tax Anti-Injunction Act. It reaches no farther than to find and declare the intention of the Congress in enacting that law. It does not declare rules of law of general application. It does not by analogy or otherwise define or limit the application of article XIII, section 32 of the California Constitution nor of its implementing statute.

The federal Tax Anti-Injunction Act is a statute, enacted by the Congress in its original form in 1867 as an amendment to another statute which barred suits for tax refunds until after certain administrative remedies had been exhausted. (*Id.*, 465 U.S. at p. 373 [79 L.Ed.2d at p. 378].) Its purpose, and its effect, are limited and governed by the intent of the Congress by which it was enacted, and by the Constitution of the United States.

The California Constitution is the organic law of this state, established by the People. It is subordinate only to the Constitution of the United States. Article XIII, section 32, which governs the case at bench, is a constitutional mandate implemented by a statute. (Rev. & Tax. Code, § 19081.) As we have noted, above, " ' ' "[t]he provision of the California Constitution is much more than a mere declaration of the rules generally applicable in proceedings for injunction, mandamus, or other legal or equitable relief." . . . It follows that cases . . . which discuss the various instances under which an injunction may be available according to the common law rules of equity or under statutes restating them are not relevant here.' " (*Pacific Gas & Electric Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d 277, 282.)

We conclude that Safeco has not been deprived of a constitutionally cognizable property interest so as to invoke the due process requirements of the Fifth Amendment of the Constitution of the United States and thereby to create an exception to the constitutional bar of section 32.

*Estoppel Cannot Be Raised Against the State in Contravention of California Constitution, Article XIII, Section 32*

In the leading case of *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423], our Supreme Court pronounced the California rule governing the application of equitable estoppel against the government, as follows: ". . . the proper rule governing equitable estoppel against the government is the following: The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Id.*, at pp. 496-497.)

In *Mansell,* our Supreme Court stated, at page 493: "It is settled that '[t]he doctrine of equitable estoppel may be applied against the government where justice and right require it. (*United States Fid. & Guar. Co.* v. *State Board of Equalization* (1956) 47 Cal.2d 384, 388-389 [303 P.2d 1034] and

cases there collected.)' (*Driscoll* v. *City of Los Angeles, supra,* 67 Cal.2d 297, 306 [61 Cal.Rptr. 661, 431 P.2d 245].) [Citations.] Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public, . . .' (*County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 829-830 [186 P.2d 124, 175 A.L.R. 747], see also cases there cited.) The tension between these twin principles makes up the doctrinal context in which concrete cases are decided."

In a later decision, our Supreme Court added that: ". . . [N]o court has expressly invoked principles of estoppel to contravene directly any statutory or constitutional limitations." (*Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 28 [157 Cal.Rptr. 706, 598 P.2d 866]; accord *City of Fresno* v. *California Highway Com.* (1981) 118 Cal.App.3d 687, 697 [173 Cal.Rptr. 671].)

Thus, estoppel will not be applied against the government if the result would be to nullify a strong rule of policy adopted for the benefit of the public (*Mansell, supra,* 3 Cal.3d at p. 493; accord *Longshore* v. *County of Ventura, supra,* 25 Cal.3d 14, 28; *State of California* v. *Superior Court (Fogerty)* (1981) 29 Cal.3d 240, 244 [172 Cal.Rptr. 713, 625 P.2d 256]; *Baillargeon* v. *Department of Water & Power* (1977) 69 Cal.App.3d 670, 680 [138 Cal.Rptr. 338]) or to contravene directly any statutory or constitutional limitations. (*Longshore, City of Fresno, supra.*)

 In the case at bench the application of estoppel to prevent the FTB from complying with its statutory duty and conducting an investigation to determine and collect the liability of Safeco's policyholders for personal income taxes (Rev. & Tax. Code, § 19254; *Brovelli* v. *Superior Court, supra,* 56 Cal.2d at p. 529), would clearly "nullify 'a strong rule of policy, adopted for the benefit of the public'" (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at p. 493), and would "contravene directly . . . statutory [and] constitutional limitations." (*Longshore* v. *County of Ventura, supra,* 25 Cal.3d at p. 28.) That policy and those limitations have been established by the people in our Constitution (§ 32), enacted as statute law by the Legislature (Rev. & Tax. Code, § 19081), and repeatedly declared to be our public policy in the opinions of our courts (for example, *Modern Barber Col.* v. *Cal. Emp. Stab. Com., supra,* 31 Cal.2d 720, 731-732; *Pacific Gas & Electric Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d at pp. 283-284, wherein our Supreme Court stated, "The policy behind section 32 is to allow revenue collection to continue during litigation . . . . [¶] We hold

that section 32 means what it says"; *United States Steel Corp.* v. *Franchise Tax Board, supra,* 144 Cal.App.3d 473, 481-482).

 Even if there were no constitutional, statutory or decisional bars to the raising of an estoppel to prevent or enjoin the collection of a tax by the state, an estoppel could not be raised in the case at bench because one of the essential elements of an estoppel is missing.[13] In California, there are four elements necessary to apply the doctrine of estoppel: " '. . . (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 489.)

In the case at bench there is no showing of an injury to Safeco which would justify the raising of an estoppel.

In order to raise an estoppel against the government there must be a clear showing that the private party's reliance upon the government's conduct has caused him to change his position for the worse, that is, that the reliance has caused him to suffer injury. Here there is no showing that Safeco has suffered any injury, nor that Safeco has been deprived of something to which it was entitled as of right. Safeco has lost no property interest nor any legal right, vested or contingent. (Cf. *Heckler* v. *Community Health Care Services of Crawford County, Inc.* (1984) 467 U.S. 51, — [81 L.Ed.2d 42, 53, 104 S.Ct. 2218]; *Investment Annuity, Inc.* v. *Blumenthal, supra,* 609 F.2d at pp. 7-8.) As we review the record we find that Safeco has lost nothing to which it had a right in the first place. Safeco is not asked to repay funds, it is not asked to pay additional taxes and has suffered no adverse change in its status. And Safeco's policyholders have lost only their expectations of not having to pay taxes currently, but only eventually. They have not lost their right to pay their taxes and sue for a refund, at which time, as privies of Safeco, they may seek to raise the question of estoppel if they choose to do so. (*Roper* v. *Smith* (1919) 45 Cal.App. 302, 306 [187 P. 454]; 28 Am.Jur.2d 773, Estoppel and Waiver, § 114.) We find that Safeco has not suffered a cognizable injury such as is necessary in order to raise an estoppel.

Safeco has cited us to no authority for the proposition that the State of California or its officers can be estopped, prevented or enjoined from the collection of any tax, and in our independent research we have found none.

---

[13]Where one of the elements of an estoppel is missing there can be no estoppel. (*Hersch* v. *Citizens Savings & Loan Ass'n.* (1983) 146 Cal.App.3d 1002, 1011 [194 Cal.Rptr. 628].)

In *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at page 493, our Supreme Court cited *U. S. Fid. & Guar. Co.* v. *State Bd. of Equal., supra,* 47 Cal.2d 384, 388-389 in support of the rule that estoppel may be applied against the government where justice and right require it.

We have reviewed all of the seven decisions cited in *U. S. Fid. & Guar. Co.* v. *State Bd. of Equal., supra,* 47 Cal.2d 384, 389, in support of its declaration that "[t]he government may be estopped in tax matters." Five of the cases are from the California courts. Each of these five is an action for refund of taxes paid; four of them are for taxes which had been paid under protest and the fifth was for the refund of taxes alleged to have been illegally collected. None of them contravened section 32, which bars only the prevention or enjoining of the collection of a tax and expressly authorizes actions to recover taxes paid which are claimed to be illegal. Furthermore, two of those cases were against the City of Los Angeles and the County of Los Angeles, respectively, and, as we have seen, section 32 bars only actions against the state or its officers. (*Eisley* v. *Mohan* (1948) 31 Cal.2d 637, 641 [192 P.2d 5].) The remaining two of the seven cases cited are federal cases, from the Fifth and Sixth Circuits respectively, and have no bearing whatever on the issues presented in the case at bench.

The California tax cases in which estoppel has been raised, and which have been brought to our attention or which we have found, have been actions for the recovery of taxes paid. The rule of *U. S. Fid. & Guar. Co.* v. *State Bd. of Equal., supra,* 47 Cal.2d at page 389, that "[t]he government may be estopped in tax matters," is very narrowly applied. The decision which points out the proper limitations on that rule is *La Societe Francaise* v. *Cal. Emp. Com.* (1943) 56 Cal.App.2d 534 [133 P.2d 47], cert. den. 320 U.S. 736 [88 L.Ed. 436, 64 S.Ct. 35], in which the taxpayer had failed to pay unemployment insurance taxes in reliance on an erroneous administrative tax ruling. In that case the employer, pursuant to the California Unemployment Insurance Act, deducted the unemployment insurance contributions due from its employees, and allocated its own contributions to the payment of the tax. By formal ruling the tax agency ruled that the *Societe,* as a charitable institution, was not subject to the tax. In reliance on that ruling the *Societe* then refunded to its employees the amounts it had deducted from their salaries and used the money which had been its own share for other purposes. Two years later the tax agency reversed its ruling and collected from the *Societe* (retroactively) the total tax imposed on both employer and employees, together with penalties and interest. The *Societe* paid those sums under protest and brought an action to recover them, contending that under the facts of that case the state was estopped from collecting and retaining those sums. The court ruled that no estoppel could apply against

the state as to the portion of the tax directly due from the *Societe* but, as to the portion of the tax due from the employees, and as to penalties and interest, the court ruled that the state was estopped. In so ruling, the court stated: "It is our view that in the present case a proper regard for the protection of the interests of the government in its revenues, with recognition also of a degree of responsibility on the part of the government to a taxpayer who has relied to his prejudice on an official ruling, is achieved by requiring the taxpayer to discharge that part of the tax burden which it was contemplated it should bear by the statute imposing the tax, while relieving it from liability for the employees' contributions and interest on delayed payments. The taxpayer will pay from its own funds as much as it would have paid originally but for the erroneous administrative ruling, but it will not pay more." (*Id.*, at p. 555.)

The effect of the ruling in *La Societe* is that where there is a failure to pay a tax because of reliance on an erroneous administrative tax ruling there is no estoppel against the state in the collection of the tax itself; however, the government is estopped from the collection of penalties, interest, and the liability to withhold and pay the taxes of others, such as employees.

In *Market St. Ry. Co.* v. *Cal. St. Bd. Equal.* (1955) 137 Cal.App.2d 87 [290 P.2d 20], an action to recover sales taxes paid under protest resulting from an erroneous administrative ruling as to sales tax, the court relied upon and quoted extensively from the opinion in *La Societe.* Later, in *U. S. Fid. & Guar. Co.* v. *State Bd. of Equal., supra,* 47 Cal.2d 384, an action to recover taxes paid under protest resulting from the failure of a taxing agency to collect taxes on certain bail bond premiums, our Supreme Court adopted and quoted generously from the opinion in *Market St. Ry. Co.,* which had included language from *La Societe.* Our Supreme Court said: "The government may be estopped in tax matters. [Citations.] However, it is the unusual case in which estoppel will be applied in tax cases; the case must be clear and the injustice great . . . . 'The power of taxation shall never be surrendered or suspended by any grant or contract to which the State shall be a party.' (Cal. Const., art. XIII, § 6.) It is said in *Market St. Ry. Co.* v. *California State Board of Equalization, supra,* 137 Cal.App.2d 87, 100: '. . . The state board cites many cases from this and other jurisdictions to the effect that an estoppel based upon reliance upon an erroneous construction of the statute by an administrative ruling will not lie against the government, particularly in tax matters. As a general proposition this is sound law. Obviously, a tax administrator should not be permitted by an erroneous ruling to exempt a taxpayer from the obligation to pay taxes. But that is as far as the rule goes. The proper limitations on that rule were pointed out by this

court in *La Societe Francaise* v. *California Emp. Com.*, 56 Cal.App.2d 534 [133 P.2d 47], in which a petition for hearing was unanimously denied. . . . [¶] 'As to that portion of the tax imposed directly on the Societe the court had the following to say (p. 553): "It is the general rule that the government does not lose its revenues because of an erroneous ruling of an administrative official as to the meaning of a tax law. [Numerous citations.] An administrative regulation which is in conflict with the statute is invalid and the government is not bound thereby. [Citations.] The duty of the tax officials is to collect taxes imposed by law . . . it is generally no defense that taxes were not paid when due in reliance on an official ruling of nonliability. The taxpayer is deemed to act with knowledge that administrative officials cannot bind the government by their erroneous interpretation of tax statutes.""" (*U. S. Fid. & Guar. Co.* v. *State Bd. of Equal.*, *supra*, 47 Cal.2d at pp. 389-390; cf. *Pacific Motor Transport Co.* v. *State Bd. of Equalization* (1972) 28 Cal.App.3d 230, 242 [104 Cal.Rptr. 558]; *Heckler* v. *Community Health Care Services of Crawford County, Inc.*, *supra*, 467 U.S. 51, — [81 L.Ed.2d 42, 51-52].)

We find that the respondent court erred in ruling that the subpoena was not regularly issued and that it violated the right to privacy of Safeco's policyholders under article I, section 1, of the California Constitution; that the court acted in excess of its jurisdiction in these proceedings by making a judicial review of tax proceeding prior to the collection of the tax by ruling that the FTB is estopped from changing its position retroactively as to the taxability of income on the policies which Safeco has sold; and that the court failed to exercise its jurisdiction by failing to make an order, which the law enjoins, compelling Safeco to comply with the subpoena.

### DECISION

The alternative writ of mandate is vacated.

Let a peremptory writ of mandate issue commanding respondent court to vacate its order denying the petition of the FTB for an order compelling respondent Safeco to comply with the subpoena duces tecum issued to and served upon Safeco by the FTB and to make an order compelling such compliance.

Klein, P. J., concurred.

**LUI, J.,** Concurring and Dissenting.—I reluctantly concur in the majority's holding that binding precedent prevents Safeco's challenge to the subpoena in a special proceeding brought pursuant to Revenue and Taxation Code

sections 11187-11188 and that Safeco's assertion that the subpoena seeks information in violation of its policyholder's right of privacy is without merit. However, my agreement with the majority ends with these limited points. Entities in Safeco's position must have the right to litigate the retroactive application of rulings they have obtained from the Franchise Tax Board (FTB).

Safeco has a cognizable property right in its investment annuity contracts which the majority view ignores. If the majority view is left standing, Safeco (and others similarly situated) will be deprived of the due process right to litigate such issues in future proceedings. In taking such position, the majority misreads and misinterprets the holdings of several key federal and state appellate decisions. I do not join in the majority opinion because it contains language which, in my view, offends notions of fairness and justice.

Since this petition addresses a substantial question of first impression which will have a profound and lasting impact on the citizens of this state and members of the bar, I will set forth my reasoning in detail.

I

*Pertinent Background*

The facts are not in dispute. Safeco is one of several insurance companies that sold the investment annuity contracts (contracts) which are in controversy. Beginning in 1965, the Internal Revenue Service (IRS) issued a series of private letter rulings declaring that the "income generated by the assets held in custodial accounts was taxable to the insurance company, not the policyholder. . . . Sales of the contracts, initially modest, mushroomed when business and financial publications heralded them as permitting taxpayers to avoid taxation on investment earnings while retaining control and liquidity. [Fn. omitted.]" (*Investment Annuity Inc.* v. *Blumenthal* (D.C.App. 1979) 609 F.2d 1 at p. 3 (*Investment Annuity*).)

The IRS eventually reconsidered its position and issued Revenue Ruling 77-85 (I.R.B. 1977-15) in which it reversed its earlier position. The IRS ruled that the policyholders of these contracts must include interest, dividends and other income deposited into the custodial accounts, established in conjunction with the contracts, in their current tax returns as gross income rather than deferred income. Under the authority granted the IRS pursuant to section 7805(b) of the Internal Revenue Code,[1] Revenue Ruling

---

[1]Under Internal Revenue Code section 7805(b), the Secretary of the Treasury or his delegate (usually the Commissioner of IRS) may prescribe the extent, if any, to which any ruling will be applied without retroactive effect.

77-85 provided that "in view of policyholders' reliance on IRS's earlier determinations, . . . IRS 'grandfathered' existing contracts, applying its ruling [77-85] only to new accounts or existing accounts to which a contribution was made after March 9, 1977." (*Id.*)

Prior to the issuance of Revenue Ruling 77-85, Safeco had sought rulings from both the IRS and the FTB to confirm the position that the income from the investments generated by the contracts would be deferred for tax purposes. It sought these rulings on its own behalf and for its client Earl Fauser with whom Safeco intended to consummate such a contract. Under IRS procedures,[2] Safeco was entitled to obtain a ruling even though it proposed a contractual arrangement in which it would not be the payor of tax on the interest, dividend and other income accumulated in the custodial accounts. Safeco obtained such a ruling from the IRS.

FTB regulations effective during this period provided that in the absence of its own regulations, the Internal Revenue Code and regulations issued thereunder would, insofar as possible, govern the interpretation of conforming state statutes. (See Cal. Admin. Code, tit. 18, § 19253.)[3] Also, the FTB had announced in April 1978 that it would issue revenue rulings using guidelines patterned after those issued by the IRS. (See 2 Peterson et al., Cal. Taxation (1983) § 27.01[2], pp. 27-8 to 27-9.) As most prudent taxpayers would do, Safeco also sought and obtained a similar ruling from the FTB as to the state income tax consequences of these contracts.

Following the IRS's issuance of Revenue Ruling 77-85, the FTB informed Safeco that it agreed with that ruling and that it was going to revoke its prior ruling retroactively and tax the income accumulated and credited to the custodial accounts currently.

Subsequently, the FTB wrote Safeco indicating that the FTB was prohibited by law from applying Revenue Ruling 77-85 *prospectively* to contracts entered into *after* March 1977 since a *prospective* application would constitute an unlawful gift of public funds in violation of the California Consti-

---

[2]While the record is silent on the exact IRS procedure Safeco utilized in obtaining the IRS ruling, Rev. Proc. 80-29 (I.R.B. 1980-26) is instructive. This IRS administrative procedure authorizes the issuance of a ruling by the IRS to a *sponsor* organization concerning the acceptability of master or prototype pension, annuity, and profit-sharing plans and the status of related trust or custodial accounts. Rev. Proc. 80-29 superseded earlier IRS procedural pronouncements.

The IRS and FTB issuance of rulings to Safeco is evidence that Safeco was entitled to seek and obtain such a ruling in the first instance.

[3]See Revenue and Taxation Code section 17024.5, effective July 28, 1983, which essentially provides for the same reliance on federal tax statutes and regulations.

tution. The FTB then served Safeco with an administrative subpoena, presumably as a first step in assessing taxes against the policyholders. Following Safeco's refusal to comply with the subpoena, the FTB informed Safeco that it would hold Safeco accountable for any tax lost by reason of the expiration of the statute of limitations before assessments against the individual policyholders could be made.

## II

### *Safeco Has a Vested Right Which Is Entitled to Due Process Protection*

Safeco makes a convincing argument that its constitutional due process rights will be violated if it is unable to assert its challenges to the administrative subpoena in these proceedings because it is not a taxpayer who can seek a review of the FTB actions by way of a refund suit.

A. *Safeco Has a Vested Right in Its Contracts and Therefore Has Standing to Challenge the Impairment of Such Contracts by Retroactive Revocation of the FTB's Ruling*

The majority's conclusion that Safeco has no cognizable property interest subject to due process protection is simply erroneous.

It cannot be seriously disputed that the original rulings by the IRS and the FTB were the essential, if not the key, motivating factors in Safeco's decision to sell these contracts and the policyholder's decision to acquire them. (See *Investment Annuity, supra,* 609 F.2d 1, 3.) Once these rulings were issued and clearance from the California Insurance Commissioner was obtained, Safeco and the other insurance companies sold these contracts in reliance on such rulings. Undoubtedly, Safeco paid commissions, made contractual commitment for the custodial accounts and investment of funds received from the policyholders. If the FTB is successful in revoking its ruling retroactively, Safeco may be faced with the potential liability to rescind the contracts and to restore the consideration it received from the policyholders and the concomitant loss of customer goodwill. Given these circumstances, it is clear that the loss of the tax deferral treatment on the *existing* contracts will impair the value of such contracts to the policyholders and to Safeco.

As stated by our Supreme Court in *Miller* v. *McKenna* (1944) 23 Cal.2d 774, 783 [147 P.2d 531], ". . . a vested right, as that term is used in relation to constitutional guaranties, implies an interest which it is proper for the state to recognize and protect, and of which the individual may not

be deprived arbitrarily without injustice. The question of what constitutes such a right is confided to the courts."

In *Estate of Gill* (1971) 19 Cal.App.3d 496, 501 [96 Cal.Rptr. 786], the Court of Appeal stated that "[t]he retrospective application of a statute is unconstitutional only if it deprives a person of a vested right, or impairs the obligation of a contract. [Citations.] If it does neither of these things, it is not objectionable on the ground that it applies to past transactions. (*Pignaz* v. *Burnett* (1897) 119 Cal. 157, 160 [51 P. 48].)" The appellate court rejected the controller's attempt to retroactively apply Revenue and Taxation Code section 13644 so as to tax decedent's estate for decedent's lifetime gift to her daughter as being made without full and adequate consideration.

In *Union Oil Co.* v. *Moesch* (1979) 88 Cal.App.3d 72 [151 Cal.Rptr. 517], this court considered Union Oil's challenge that the application of Business and Professions Code section 20999.1 (which generally prohibits the termination of franchise agreements between petroleum distributors and gasoline station operators except for cause) impaired its leases with the operators. We concluded that Union Oil's contract rights were not impaired because the original leases had terminated automatically by their own terms and the tenancy had continued on a month-to-month basis subsequent to the effective date of section 20999.1. Addressing Union Oil's claims, this court stated, "[i]t is a fundamental principle of constitutional law that a statute may not, in general, be applied retroactively so as to impair an existing contractual obligation or deprive a person of a vested property right. (See *Estate of Gill* (1971) 19 Cal.App.3d 496, 501 [96 Cal.Rptr. 786].) Both the United States and California Constitutions specifically incorporate clauses prohibiting impairment of contracts (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9; see 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 619, p. 3918) and the cases are legion which recognize this precept (see *Bradley* v. *Superior Court* (1957) 48 Cal.2d 509, 519 [310 P.2d 634], and cases cited therein). [¶] Were Moesch [a gas station operator] attempting to apply section 20999.1 to the original lease which was executed some two and one-half years prior to the effective date of the statute, we would be compelled, in accord with the decision in *Mobil Oil Corp.* v. *Handley, supra,* 76 Cal.App.3d 956 [143 Cal.Rptr. 321], to hold any such attempted application unconstitutional. In the cited case, Division Two of this court held that an unconstitutional impairment of contractual rights would result if section 20999.1 were applied retroactively to a lease which had been executed (and, in that case, terminated without renewal) prior to the statute's effective date. (*Id.,* at pp. 964-965; see also *Globe Liquor Co.* v. *Four Roses Distillers Company* (Del. 1971) 281 A.2d 19, 21.)" (*Id.,* at p. 77.)

Unlike *Union Oil Co.* v. *Moesch,* a finding of contractual impairment cannot be avoided in this case. If the tax deferral is lost, the continuing vitality of the existing contracts is lost as well.

In *Associated Cal. Loggers, Inc.* v. *Kinder* (1978) 79 Cal.App.3d 34 [144 Cal.Rptr. 786], the appellate court considered the claim of two business associations that the Insurance Commissioner was impairing their contracts with workers' compensation carriers by challenging the association's service agreements with the carriers. The Insurance Commissioner contended that the service agreements violated Insurance Code section 755 because that section prohibited payments of commissions or other consideration to a nonlicensed person and the service agreements provided for such illegal payments to the associations. The appellate court sustained the trial court's determination of the associations' standing to challenge the Insurance Commissioner's threatened action since they were an affected third party with an economic interest. The court affirmed the preliminary injunction against the Commissioner stating: "In short, the commissioner, by invalidating these service contracts, is promulgating a rule which in effect prohibits providers of workers' compensation insurance from contracting to have administrative services performed by the insured. Declaratory relief would seem to be the accepted and statutorily authorized method of testing the legality of such a policy. [¶] Further, while all contracts of insurance in California are necessarily written with cognizance of the Insurance Code provisions and in contemplation of the state's exercise of its inherent police power (*Roach* v. *Hostetter* [1941] 48 Cal.App.2d 375, 379 [119 P.2d 749]; *Mott* v. *Cline* [1927] 200 Cal. 434 [253 P. 718]) the constitutional prohibition against impairment of contractual obligation implicitly requires the availability of judicial review of any order of cancellation issued by the commissioner. The unilateral decision or interpretation of the commissioner must be subject to judicial scrutiny. Declaratory relief is the traditional method by which parties to a contract can have their rights in the contract determined. (Code Civ. Proc., § 1060.) [¶] We hold that [the associations] have standing and are entitled to obtain judicial review of the commissioner's order and [the carriers] acquiescence thereto." (*Ibid.,* 79 Cal.App.3d at pp. 42-43.)

While *Associated Cal. Loggers, Inc.* v. *Kinder* is distinguishable on grounds that it deals with insurance matters in which there is no statutory or constitutional impairment against injunctive or declaratory relief, the opinion is authority on the issue of standing of interested third parties to assert a constitutional challenge to an impairment of their contracts.

Finally, in *Trans-Oceanic Oil Corp.* v. *Santa Barbara* (1948) 85 Cal.App.2d 776 [194 P.2d 148], this court held that the owner of an oil

lease which acquired a permit from the City of Santa Barbara to drill an oil well and in reliance thereon, properly expended substantial sums in preparation for drilling, acquired a vested property right to proceed under the permit. We reversed the trial court's judgment denying Trans-Oceanic's writ of mandate seeking to reinstate the permit stating: "A permit may not be revoked arbitrarily 'without cause.' (53 C.J.S. § 44, p. 651.) It is conceded that in revoking the permit granted to appellant, the City Council of Santa Barbara did so without prior notice to appellant, without a hearing, and without evidence. In determining that a permit, validly issued, should be revoked, the governing body of a municipality acts in a quasi-judicial capacity. In revoking a permit lawfully granted, due process requires that it act only upon notice to the permittee, upon a hearing, and upon evidence substantially supporting a finding of revocation." (*Id.*, at p. 795.) (See also *Cooper* v. *County of Los Angeles* (1975) 49 Cal.App.3d 34, 42-43 [122 Cal.Rptr. 464]; *Court House Plaza Co.* v. *City of Palo Alto* (1981) 117 Cal.App.3d 871, 884-885 [173 Cal.Rptr. 161]; and *City of San Marino* v. *Roman Catholic Archbishop* (1960) 180 Cal.App.2d 657, 669 [4 Cal.Rptr. 547].)

Based upon the foregoing, I conclude that Safeco has demonstrated a vested right in its contracts sufficient to justify standing to challenge the FTB's retroactive revocation of its ruling.

B. *Investment Annuity Is Inapposite to the Facts Presented in This Petition*

In concluding Safeco has no standing in any proceeding concerning the FTB's change of position, the majority relies heavily on *Investment Annuity* and erroneously concludes that that decision presented a factual situation substantially equivalent to the case at bench.

*Investment Annuity* concerned an appeal of the federal district court's order granting various insurance companies a judgment declaring Revenue Ruling 77-85 erroneous and enjoining the IRS from applying it to *prospective* purchasers of investment annuities after March 9, 1977. Because Revenue Ruling 77-85 "grandfathered" all existing annuities issued pursuant to former IRS's rulings, there was no reason for the circuit court in *Investment Annuity* to address the substantive issue of a retroactive application of Revenue Ruling 77-85—the issue with which we are squarely confronted. The majority's reliance on *Investment Annuity* is misplaced.[4]

---

[4]It is patently clear from the language in *Investment Annuity* that the circuit court was faced only with a challenge to the *prospective application* of the ruling when the court stated

## C. *South Carolina v. Regan Recognizes the Standing of a Nontaxpayer Who Lacks the Remedy of a Tax Refund Suit to Seek Declaratory Relief*

The United States Supreme Court expressed its concern in *South Carolina v. Regan* (1984) 465 U.S. 367 [79 L.Ed.2d 372, 104 S.Ct. 1107], about providing a remedy to a nontaxpayer whose property interests are affected by a change in the administration of tax laws. The government objected to South Carolina's petition to file an original action for injunctive relief in the Supreme Court on grounds that the Anti-Injunction Act barred such an action. The government did not address the merits of South Carolina's constitutional claims and argued that *Enochs v. Williams Packing Co.* (1962) 370 U.S. 1 [8 L.Ed.2d 292, 82 S.Ct. 1125], established the single judicially created exception to the Anti-Injunction Act, viz., that injunctive actions will only be allowed if, under the most liberal view of the law and the facts, the United States cannot establish its claim.

The Supreme Court stated that "[i]n each of this Court's subsequent cases that have applied the *Williams Packing* rule, the plaintiff had the option of paying the tax and bringing a suit for a refund. Moreover, these cases make clear that the Court in *Williams Packing* and its progeny did not intend to decide whether the [Anti-Injunction] Act would apply to an aggrieved party who could not bring a suit for a refund. [¶] For example, in *Bob Jones* [v. *Simon* (1974) 416 U.S. 725 (40 L.Ed.2d 496, 94 S.Ct. 2038)], . . . [The Court rejected] the taxpayer's challenge to the Act on due process grounds, *however, the court relied on the availability of a refund suit, noting that*

---

that "[h]ere, the injury caused by the shift in IRS's interpretation of the pertinent statute—a detrimental impact on appellees' business—does not invade any property interest cognizable under the due process clause. The challenged government action concerned the tax liability of investment annuity purchasers; it did not require appellees to pay taxes and hence there was no government action that directly deprived them of property. Deprivation of property underlies the long-recognized right of taxpayer to judicial review of the assessment of taxes. [Fn. omitted.] Nor did the earlier private letter rulings on which appellees relied in building their business create any 'legitimate claim of entitlement.'[24] *Such rulings* express the Commissioners' interpretation of the law at the time they are given, and may be taken into account subsequently, but they do not have the force of law and *do not bind the Commissioner to adhere to the same position in the future.*[25]" (Italics added.) The court's footnote 24 provides: "*Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).)" Footnote 25 provides: "See *Dixon v. United States,* 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965); [other citations omitted]." (609 F.2d at p. 7.)

The circuit court's citations in footnote 24 indicate that the court focused on the *prospective* application of the ruling. *Board of Regents v. Roth, supra,* held no due process deprivation of property interest in *continued* employment as a teacher; *Bishop v. Woods, supra,* held no protected property interest in *continued* employment as a policeman; and *Arnett v. Kennedy, supra,* held that a nonprobationary federal employee's right not to be discharged except for cause only *after* appropriate procedural protections, did not create an expectation of job *retention.*

*'our conclusion might well be different'* if the aggrieved party had no access to judicial review. [Citations.] Similarly, the Court left open the question of whether the Due Process Clause would be satisfied if an organization had to rely on a 'friendly donor' to obtain judicial review of the Service's revocation of its tax-exemption. [Citations.] [Fn. omitted.]'' (Italics added.) (*South Carolina* v. *Regan, supra,* 465 U.S. at p. 375 [79 L.Ed.2d at p. 379].)

The government also urged that South Carolina may obtain judicial review by issuing bearer bonds and urging the purchaser of those bonds to bring a suit contesting the legality of the TEFRA provision. The Supreme Court stated: "First, instances in which a third party may raise the constitutional rights of another are the exception rather than the rule. [Citations.] More important, to make use of this remedy, the State 'must first be able to find [an individual] willing to subject himself to the rigors of litigation against the Service, and then must rely on [him] to present the relevant arguments on [its] behalf.' *Bob Jones, supra,* at 747 n. 21, 40 L.Ed.2d 496, 94 S.Ct. 2038. Because it is by no means certain that the State would be able to convince a taxpayer to raise its claims [fn. omitted], reliance on the remedy suggested by the [government] would create the risk that the Anti-Injunction Act would entirely deprive the State of any opportunity to obtain review of its claims. For these reasons, we should not lightly attribute to Congress an intent to require plaintiff to find a third party to contest its claims." (*South Carolina* v. *Regan, supra,* 465 U.S. at pp. 380-381 [79 L.Ed.2d at p. 383].)

In my view, *South Carolina* v. *Regan* is square authority for the proposition that a nontaxpayer has standing to assert a due process claim and challenge the retroactive revocation of a tax statute or ruling.

The majority's reliance on *Pacific Gas & Electric Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 277 [165 Cal.Rptr. 122, 611 P.2d 463], is equally misplaced. That decision is not inconsistent with the views expressed in this separate opinion and is factually distinguishable from *South Carolina* v. *Regan. Pacific Gas & Electric* is premised on the fact that Pacific Gas & Electric Co. had an adequate remedy of law in a refund suit. *Pacific Gas & Electric Co.* cannot be read to apply the instant case because Safeco is not a taxpayer and has no remedy at law.

The standing of a nontaxpayer to challenge the retroactive revocation of a tax statute or ruling which impairs their contractual rights is a question of first impression in this state. In my view *South Carolina* v. *Regan* is on point and provides authority for Safeco's standing herein.

### III
### *Public Policy Dictates That Safeco Be Allowed*
### *to Pursue a Declaratory Action*

A. *A Declaratory Action Will Not Conflict With Article XIII, Section 32*

Although settled law appears to compel Safeco to comply with the FTB's administrative subpoena, Safeco may pursue a declaratory action.[5] As long as Safeco does not seek to enjoin the FTB from assessing or collecting any taxes allegedly due from individual policyholders, a declaratory action would not violate article XIII, section 32, of the California Constitution. A declaratory action would give Safeco an opportunity to litigate its claims of estoppel and make other challenges.

As our Supreme Court said in *U. S. Fid. & Guar. Co.* v. *State Bd. of Equal.* (1956) 47 Cal.2d 384, 388-389 [303 P.2d 1034]: " '[T]here are many instances in which an equitable estoppel in fact will run against the government where justice and right require it. [Citations.]' [¶] The government may be estopped in tax matters. [Citations.] However, it is the unusual case in which estoppel will be applied in tax cases; the case must be clear and the injustice great . . . ."[6]

During the last session, the Legislature passed Assembly Bill No. 3338 which, among other things, added a new section 6596 to the Revenue and Taxation Code.[7] This section provides that if the State Board of Equalization "finds that a person's failure to make a timely return or payment [of sales or use tax] is due to the person's reasonable reliance on written advice from the board, the person may be relieved of the taxes imposed by Sections 6051 [sales tax] and 6201 [use tax] and any penalty or interest added thereto." Section 6596 sets forth criteria by which the board is to determine what is "reasonable reliance on written advice from the board." This new statute in effect codifies an estoppel doctrine into the sales and use taxes law, and makes it applicable to *taxes* as well as interest and penalties.

In the court below and in this court, the only explanation offered by the FTB was that a prospective revocation of its ruling would result in a gift of

---

[5]Since this petition presents a question of substantial public concern and since the majority opinion discusses issues beyond the scope of a special proceeding, I will express my views on a declaratory action even though it is not essential to the disposition of the petition. (See *Collier* v. *Lindley* (1928) 203 Cal. 641, 645 [266 P. 526], and *California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16, 26 [61 Cal.Rptr. 618].)

[6]The court's decision (47 Cal.2d at pp. 388-389) contains numerous cases involving the question of estoppel. It is not necessary to repeat those citations here.

[7]See Statutes of 1984, chapter 1728.

public funds. I conclude that this sole assertion is incorrect as a matter of law. The essential tax feature of an annuity is to defer taxes. The taxes ultimately will be paid when the annuity payments commence to the policyholder as in the case of other tax deferral devices such as KEOGH plans, qualified employee pension and profit-sharing plans, individual retirement accounts (IRA's) and deferred compensation plans.

However, since there was no real opportunity for both parties to present the estoppel question in the court below, a conclusive determination on this question is not possible.

B. *The FTB Must Not Abuse Its Discretion Under Revenue and Taxation Code Section 19253*

Furthermore, the FTB must demonstrate that the retroactive application of its ruling is not an abuse of its discretion. Revenue and Taxation Code section 19253 provides that "[t]he Franchise Tax Board shall prescribe all rules and regulations necessary for the enforcement of this part [the Personal Income Tax Law] and may prescribe the extent to which any ruling or regulation shall be applied *without retroactive effect.*" (Italics added.)

The language in section 19253 is virtually identical to that contained in section 7805(b) of the Internal Revenue Code which the United States Supreme Court had occasion to review in *Dixon* v. *United States, supra,* 381 U.S. 68. Although the Supreme Court held in *Dixon* that the IRS did not abuse its discretion in changing its position retroactively to correct a mistake in law, it does not appear that the IRS may do so without some articulated justification.[8]

---

[8]"Although the *Dixon* case appears to give the Commissioner broad authority to correct erroneous interpretations of the law, the Commissioner has imposed certain limitations in applying this authority. [Fn. omitted.] [¶] '*Except in rare or unusual circumstances, the revocation or modification of a ruling will not be applied retroactively with respect to the taxpayer to whom the ruling was originally issued or to a taxpayer whose tax liability was directly involved in such ruling* if (1) there has been no misstatement or omission of material fact, (2) the facts subsequently developed are not materially different from the facts on which the ruling was based, (3) there has been no change in the applicable law, (4) the ruling was originally issued with respect to a prospective or proposed transaction, and (5) the taxpayer directly involved in the ruling acted in good faith in reliance upon the ruling and the retroactive revocation would be to his detriment.'[127]" (Italics added.) The court's footnote 127 provides: "*Ibid.*, section 17.05." (*IRS National Office Procedures—Rulings, Closing Agreements,* The Bureau of National Affairs, Inc., 104-6th (US), pp. A-15 to 16.)

"The purpose behind the granting to the Commissioner of discretion to apply rulings and regulations without retroactive effect is stated in the legislative history accompanying the Revenue Act of 1934: [¶] 'Regulations, Treasury Decisions, and rulings which are merely interpretive of the statute, will normally have a universal application, but in some cases the application of regulations, Treasury Decisions, and rulings to past transactions, which have

Since the IRS exercised its discretion to make Revenue Ruling 77-85 prospective only, and the FTB has not explained why it has not exercised a similar grant of discretion, the issue of the FTB's abuse of discretion has not yet been litigated.

C. *Public Policy Compels a Remedy for Safeco*

Two reasons of public policy demand affording Safeco standing in a declaratory action in these circumstances. First, prudent taxpayers and their counsel must be given assurance in complex and uncertain tax situations that they may rely with a sense of security on the FTB rulings, absent mistake or misinterpretations of fact or law.[9] A retroactive revocation of an FTB ruling can cause severe economic hardship to taxpayers in California. Therefore, the FTB must demonstrate, when challenged, that it has not abused the discretion given to it by the Legislature in Revenue Taxation Code section 19253. The FTB's assertion that a gift of public funds prohibits a prospective revocation of their ruling is simply insufficient as a matter of law in these circumstances.

Secondly, public policy demands that Safeco and other similarly situated persons and business entities be allowed to challenge the FTB's abuse of the discretion given it under Revenue and Taxation Code section 19253.

It is common knowledge that many citizens of this state invest in IRA accounts with banks, savings and loan institutions and other entities. In-

---

been closed by taxpayer in reliance upon existing practice, will work such inequitable results that it is believed desirable to lodge in the Treasury Department the power to avoid these results by applying certain regulations, Treasury Decisions, and rulings with prospective effect only.'[118]" Footnote 118 provides: "H.R. Rep. No. 704, 73rd Cong., 2d Sess. (1934) page 38." (*Id.,* at p. A-15.)

[9]"A lawyer must recognize tax consequences and ways of minimizing them before advising a client about a transaction. Sometimes even the most careful tax planning and research will not resolve all of the problems or questions concerning a particular transaction. The applicability of statutes and regulations is often uncertain, and precedents will frequently differ materially in their facts from the transaction at hand. In such a situation, the lawyer may want to seek the views of the IRS about a particular transaction. [¶] Guidance may be sought by questioning National Office personnel as to matters within their particular jurisdiction. The responsibility for issuing rulings has largely been delegated to the Directors of the Corporation Tax Division and the Individual Tax Division. [¶] The main reason for requesting a ruling is usually to ensure that a particular favorable tax consequence will result from a proposed transaction. In some cases the reason for confirming the tax result is due to uncertainties in the tax laws, especially as applied to a particular set of facts. In other cases, although the tax result is reasonably certain, the magnitude of possible adverse tax consequences is great enough to make the additional cost, time, and effort of obtaining a ruling worthwhile. [¶] The procedures for obtaining private rulings from the California tax authorities are much more informal than the IRS procedures. The Franchise Tax Board has indicated that the IRS guidelines for rulings can be used as a general guide. (Givner & Fried, Tax Practice in Cal. (Cont.Ed.Bar 1984) Obtaining Tax Rulings and Determinations §§ 3.5, 3.13 and 3.94.)

vestments in IRA accounts are generated through massive media campaigns by such entities. Individuals rely on representations that they will receive certain tax benefits if they invest in an IRA account. If, hypothetically, something were to go wrong and a technical deficiency were to cause the loss of a favorable tax ruling for a given IRA account retroactively, any of these entities should be allowed to challenge the FTB's retroactive revocation absent a mistake of fact or law. Under the majority view, such entities would be shut out of court leaving the average citizen to fend for himself or herself to make the difficult economic decision whether to challenge the FTB alone. In such a situation, both the financial institution and the taxpayer are harmed.

The majority's reasoning violates the maxim of jurisprudence that "for every wrong there is a remedy." (Civ. Code, § 3523.)

## IV

### Conclusion

I would hold that Safeco has standing to assert its constitutional challenges in a proper declaratory action. If successful, I would expect the FTB to respect any final declaratory judgment as binding on any litigation for administrative action concerning an assessment or refund suit by an affected policyholder. (See *California* v. *Grace Brethren Church* (1982) 457 U.S. 393 [73 L.Ed.2d 93, 102 S.Ct. 2498].)[10]

A petition for a rehearing was denied March 6, 1985, and the petition of real party in interest for a hearing by the Supreme Court was denied April 25, 1985. Bird, C. J., was of the opinion that the petition should be granted.

---

[10]At 457 U.S. pages 414-415 [73 L.Ed.2d at page 110], the court stated: "assuming that the appellees' constitutional claims are meritorious, an issue on which we express no view, there is every reason to believe that once a state appellate court has declared the tax unconstitutional the appropriate state agencies will respect that declaration. See *Pacific Motor Transport Co.* v. *State Bd. of Equalization*, 28 Cal.App.3d 230, 236, 104 Cal.Rptr. 558, 562 (1972) (noting that while the 'relief afforded may not "prevent or enjoin" or otherwise hamper present or future tax assessment or collection effort . . . [i]t will be presumed that the governmental agency will respect a judicial declaration concerning a regulation's validity')."